OPINION
Jermain Williams appeals from his conviction of carrying a concealed weapon pursuant to his no contest plea in the Montgomery County Common Pleas Court.
Williams was arrested on January 31, 2000 at 105 Maeder in Jefferson Township after Montgomery County Sheriff's deputies responded to that address to assist in evicting trespassers who refused to leave the premises.
Deputy Steven Gardiner and Deputy Kevin Burns testified for the State at the suppression hearing. Gardiner testified that the Maeder address is located in a high crime area particularly for drug activity. Gardiner was aware of incidents of shots being fired in that area and at the 105 Maeder address.
Gardiner testified he met the complainant at the Maeder address who informed him that three men were in her house and refused to leave. Gardiner said he entered the complainant's house with the complainant and Deputies Feehan, Campbell, and Burns. Gardiner testified he saw three men in the living room and requested their identification for purposes of issuing a criminal trespass notice.
Gardiner testified that the defendant was seated in a couch with his jacket partially underneath him. Gardiner said the defendant's jacket was partially over the defendant's thigh and he was touching the jacket pocket area. Gardiner said he asked the defendant to stop "messing with his jacket" and the defendant initially complied. When the defendant then moved the pocket of the jacket "around in a manner that was suspicious to me", Gardiner asked the defendant to stop moving his jacket and to stand up.
Gardiner testified that Deputy Burns then grabbed the defendant's jacket which was still on the couch and felt what appeared to be a gun. Gardiner said Burns then pulled a gun out of the defendant's jacket and he immediately handcuffed the defendant for his own safety. Gardiner testified he thought 105 Maeder was a "crack house" because of its reputation and because of the drug paraphernalia that he observed upon entering it that day.
On cross-examination, Gardiner testified that the defendant would have been patted down regardless of what he did with his coat because this was part of his process (Tr. 30), but he would not have included the defendant's coat if he had not kept fidgeting with it. (Tr. 36).
Deputy Burns corroborated much of Deputy Gardiner's testimony. Burns testified he heard Gardiner ask the defendant not to handle his coat, and when he saw the defendant make a little motion with his hands he immediately snatched the coat away from the defendant. (Tr. 46).
Officer Burns explained why he snatched the defendant's jacket:
Q. And tell me why you went to snatch the jacket?
 A. Just instinct. I considered it to be furtive. And it was just instinct to just take charge of the coat. I have no other reason other than the fact that I had a concern as to the fact that there might be a weapon in the coat and we had not frisked him yet. So I just felt that it was safe to take the coat — or the jacket, rather, away from him or get it out of his possession.
 Q. Okay. So when you heard Deputy Gardiner say stop fidgeting or something to that affect, tell me exactly what happened next.
 A. Okay. It brought my attention to Mr. Williams. I didn't really take time to focus on him. I really focused on the coat. I don't recall where his hands were. I don't remember seeing his hands either. I reached down and pretty much grabbed the coat at the collar and stepped back with it.
 Q. After grabbing the coat, did anything about it further concern you?
 A. Yes, ma'am. I had the jacket in my left hand which is the closest hand to — you know, the hand that I snatched the coat — or excuse me, jacket again. It felt heavy, heavier than normal for a jacket, a nylon jacket. I reached with my right hand. I touched the outer pocket. I didn't feel anything. I immediately transferred the jacket to my right hand. I pretty much touched the outside of the jacket with my left hand. I felt a hard object. I ran my hand along the jacket pocket and it felt as though it was a weapon or a gun. (TR. 46 and 47).
Burns stated he thought the defendant had made a furtive movement toward his jacket because he heard Deputy Gardiner tell the defendant to stop fidgeting with his jacket. (Tr. 49). Burns made no mention of seeing drug paraphernalia in the home.
In overruling the defendant's suppression motion, the trial court made the following observations:
 Regarding the existence of reasonable fear for the deputies' safety, the Court finds reasonable fear based on the following: that the neighborhood in question was in a high-crime, drug area; that the drug activity usually involves the presence of guns; that the area involved arrests for theft, criminal damaging, assault, and drug offenses, as well as shots fired; that the residence in question (105 Maeder) was the subject of numerous complaints by neighbors within the prior 30 days of drug activity and shots fired; and that the house was a crack house, as evidenced by the testimony of Deputy Gardiner as to the condition of the house inside and visible drug paraphernalia in the living room; and that the Defendant engaged in furtive movements in "fiddling" with his jacket again after he had been warned "not to mess with the jacket."
 Regarding the reasonableness of the deputies' belief that Defendant was armed, a threat to their safety and "fiddling" with a gun, the Court finds that belief to be reasonable, based also on the foregoing findings.
 The Court finds that Deputy Burns' frisk of Defendant's nylon jacket was independently justified by Terry v. Ohio (1968), 392 U.S. 1 and its progeny. The Court finds that the jacket, sat on by Defendant and partially draped over Defendant, was a part of Defendant's outer clothing and not a closed container. The Court further finds that probable cause was not required for the seizure and frisk of the jacket. When Deputy Burns seized the jacket, it felt heavier than a nylon jacket normally would weigh. When he touched the pocket, he felt a hard object like the barrel of a gun. Under Terry, Deputy Burns was constitutionally justified in reaching into the pocket of the jacket and seizing the object, which turned out to be a gun.
 Even though the deputies had the intent to frisk all three subjects, once encountered inside the residence, beginning with Mr. Lester, there was an independent, constitutionally justified basis to frisk Defendant and his partially draped jacket.
Williams contends the trial court erred in overruling his suppression motion because the deputies gave contradictory testimony and because the deputies "only articulated an unparticularized hunch that he might be armed and dangerous." (Appellant's brief at page 5).
Williams argues that since the deputies admitted they intended to pat down the suspects when they entered the complainant's home, we should regard their testimony that he engaged in "furtive" conduct with suspicion. He also argues that the deputies were not credible because they gave differing testimony about the presence of drug paraphernalia.
The Supreme Court has held "as a general matter, determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." Ornelas v. U.S. (1996), 517 U.S. 690, 116 S.Ct. 1657, 1663. The Court then added: "Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Id. The resolution of factual issues, including credibility and weight, is for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
We agree with the trial court's observation that it is not important whether the deputies intended to pat down the defendant when they entered the home if there was an objectively reasonable basis for conducting the "pat down" when it was actually conducted.
The Ohio Supreme Court has adopted the rationale of Terry, supra, holding that "where a police officer, during an investigative stop, has a reasonable suspicion that an individual is armed based on the totality of the circumstances, the officer may initiate a protective search for the safety of himself and others." State v. Bobo (1988), 37 Ohio St.3d 177,180. The officer "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man under the circumstances would be warranted in the belief that his safety or that of others was in danger." State v. Smith (1978), 56 Ohio St.2d 405, 407, citing Terry, supra, at 27. "A court reviewing an officer's actions when considering a motion to suppress must give due weight to an officer's experience and training, and view the evidence as it would be understood by those in law enforcement." State v. Andrews (1991), 57 Ohio St.3d 86,565 N.E.2d 1271, citing United States v. Cortez (1981), 449 U.S. 411.
We agree with the trial court's conclusion that Deputy Burns had a reasonable suspicion to believe that Williams was armed and dangerous when he patted down the outer clothing of Williams' jacket. Deputy Gardiner testified that his department had received several complaints of drug activity inside the complainant's house and reports of shots being fired at that location. Gardiner testified that in light of the numerous complaints about the house, its condition, and the presence of drug paraphernalia, he would characterize it as a "crack house." A prudent police officer would have patted down the defendant's jacket after observing him fidget with his jacket after being warned not to do so by a police officer and in light of the "other" circumstances present in this case. The assignment of error must be overruled.
 __________ BROGAN, J.
FAIN, J. and GRADY, J., concur.